STATE OF CONNECTICUT *v.* FRANK ALTRUI

STATE OF CONNECTICUT *v.* CHARLES DeMARTIN

SPEZIALE, C. J., PETERS, PARSKEY, ARMENTANO and SPONZO, Js.

---

162

Argued May 6—decision released August 17, 1982

*Charles P. Costanzo,* for the appellant (defendant Frank Altrui).

*Anthony J. Lasala* and *John H. Peck, Jr.,* with whom, on the brief, were *Margaret J. Berthold* and *Bruce L. Levin,* for the appellant (defendant Charles DeMartin.)

*John H. Durham,* assistant state's attorney, with whom, on the brief, were *Arnold Markle,* state's attorney, and *Cathryn Krinitsky,* law student intern, for the appellee (state).

PARSKEY, J. On July 21, 1979, the defendants, Charles DeMartin and Frank Altrui, were arrested in New Haven on a variety of criminal charges[1] stemming from an incident involving the attempted shooting of an individual on Main Street in East Haven. In a trial to the jury the defendants were convicted of all charges. In their appeal, the defendants claim: (1) that the court erred in permitting a key witness, Michael Solevo, to assert the privilege against self-incrimination; (2) that they were denied due process by the state's alleged suppression of a tape recording of Solevo's "recantation"; (3) that the court should have suppressed a shotgun and bullets found in the defendant Altrui's car; and (4) that the court erred in communicating ex parte with a juror.

The jury could have found the following facts: On the evening of July 21, 1979, Michael Solevo was working at his family's restaurant, "Antonio's," which is located on Main Street in East Haven. The Solevo family was "on [its] toes" while at work as a result of certain persons pressuring Solevo's father for money. Aside from other related inci-

---

[1] The defendants were charged in five counts with criminal attempt to commit assault in the first degree, conspiracy to commit assault in the first degree, reckless endangerment in the first degree, possession of weapons in vehicles and possession of a shotgun in a motor vehicle.

dents, less than two weeks before the evening in question the front window of the Solevo home had been shot out following problems at the restaurant.

At approximately 8:15 p.m., Solevo saw a black Cadillac Eldorado pull up and double-park in front of the restaurant. Solevo had a clear view of the passenger whom he immediately positively identified as the defendant DeMartin and a profile view of the driver whom he later positively identified as the defendant Altrui. Solevo had known both men for approximately ten years.

The Cadillac, which was subsequently identified as belonging to Altrui, then pulled up and parked in front of a market located immediately adjacent to Antonio's. Solevo went out the side door of the lounge and watched as the passenger's door of the car opened and the passenger's leg came out. Solevo also saw what he thought might be a cane. He went back into the restaurant to ask his uncle if DeMartin had been walking with a cane. When the uncle responded that he knew nothing of DeMartin using a cane, Solevo said that DeMartin must then have a shotgun.

Solevo walked back outside through the side door of the lounge, and he observed one John Taddei, another codefendant, walking toward the Cadillac in which the defendants were sitting. Upon seeing Solevo standing near the corner of the building, Taddei pointed at him. At that point the driver's door of the Cadillac opened and the defendants emerged. Altrui had a shiny object in his hand which looked like a handgun and which was subsequently recovered from Altrui's Cadillac and proved to be an operable nickel-plated .38 caliber revolver. DeMartin was armed with a firearm

which also was recovered from the Altrui vehicle and which proved to be a .12 gauge pump shotgun. DeMartin put the shotgun up to his shoulder, Solevo jumped back behind the corner of the building, and DeMartin fired, missing Solevo but hitting two youths who were some distance away.

East Haven police were dispatched to the restaurant at 8:23 p.m. After a preliminary review of the situation, a broadcast was issued for the police to be on the lookout for DeMartin, the black Cadillac Eldorado (including a partial plate number), and for the need to use caution in approaching the vehicle due to the suspected presence of a shotgun. At approximately 8:30 p.m., New Haven police located the car at GG's Lounge in the Fair Haven section of New Haven. DeMartin and Altrui were standing together next to the vehicle and no one else was near the car. The distance from Antonio's to GG's Lounge is approximately three miles and takes about eight minutes to drive.

East Haven police immediately proceeded to the lounge with Solevo who upon arrival immediately and positively identified DeMartin, Altrui, and Altrui's vehicle. The defendants were then arrested by the East Haven police. In addition, the Altrui vehicle was seized as evidence. As the vehicle was being prepared for towing, the driver's door was opened so that the front wheel drive linkage could be disengaged. When the door was opened, the interior lights went on and a .12 gauge shotgun and a .38 caliber nickel-plated revolver were observed in plain view on the front floor of the car. Later, when the car was being inventoried at the New Haven police department garage, a spent .12 gauge shotgun shell was discovered, as well as a live .38 caliber round.

The physical evidence developed during the investigation confirmed the fact that the shotgun recovered from the Altrui vehicle fired the shot at Solevo. Ballistics evidence connected the shotgun and the shotgun shell found in the Altrui car with a plastic shotgun shell wad and shotgun pellets discovered at the crime scene. The barrel of the shotgun provided a fingerprint of Altrui. Evidence also established that the shotgun and the revolver were operable and that neither DeMartin nor Altrui had a state or local permit.

## I

### SOLEVO'S FIFTH AMENDMENT PRIVILEGE

During the prosecution's case-in-chief the state called Michael Solevo as its first witness. Solevo testified on direct examination on December 6 and 7, 1979. After the state completed its direct examination of Solevo, the defendants moved for and were granted a recess in the trial so that they might better prepare their cross-examinations. The defendants cross-examined Solevo from December 11 through 13, 1979. The state asked only two questions on redirect examination and there was no recross. Solevo answered each and every question put to him by the prosecution and the defendants during the five separate days he was on the witness stand. On January 1, 1980, while the trial was in recess, Kent Kelsey, who had known all three codefendants for varying periods of time, met with Michael Solevo. From there Kelsey went to codefendant John Taddei's home to tell Taddei that Solevo wanted to change his testimony. Thereafter counsel for DeMartin called a representative from the state attorney's office and informed him that Solevo wished to talk to the defense. The prosecution contacted Solevo to find out what his intentions

were and recorded this conversation. On January 2, 1980, the defense advised the court of the January 1, 1980 events and the state advised the court and counsel that it had spoken with Solevo. Counsel for DeMartin advised the court that he would be meeting with Solevo to talk with him about his alleged desire to change his testimony. On January 9, 1980, the state rested its case in chief.

On January 17, 1980, Altrui called Solevo to testify. Solevo exercised his fifth amendment rights on twelve separate and specific questions.[2] Neither

---

[2]      MICHAEL SOLEVO,
         called as a witness, having been previously
         sworn, testified as follows:

DIRECT EXAMINATION BY
MR. COSTANZO:

"Q. Mr. Solevo, you have previously been sworn. Are you here today under subpoena? Are you here today in response to my subpoena?

"A. Yes.

"Q. And are you here today with your counsel?

"A. Yes.

"Q. Now, directing your attention to January 1st of 1980, did you have occasion to have a phone conversation with Mr. John Durham of the State's Attorney's Office?

"A. I refuse to answer on the grounds it might tend to incriminate myself.

"Q. Well, Mr. Solevo, at any time, between the date of December 6th, 1979, which is the date you testified to, and January 1st, 1980, did you ever make any statements to anyone concerning the testimony that you gave in this court, and the possibility that it might not be true?

"A. I refuse to answer on the grounds it may tend to incriminate myself.

"Q. Mr. Solevo, directing your attention to your testimony of December 6, 1979, can you tell me if you ever stated to anyone, between December 6, 1979 and January 1, 1980, that your answer to a question, and your answer reads: 'I noticed a black car pulling up, double park in front, right in front of my car, and the passenger of the car I recognized to be Charlie DeMartin'; did you ever tell anyone, during that period of time, that that statement that you made in court was not true?

the state nor DeMartin was allowed to cross-examine the witness. Upon the conclusion of this series the defendants moved for a mistrial which the court denied.

The critical question is whether in freely testifying both on direct and on cross-examination concerning the shooting incident Solevo waived his fifth

"A. I refuse to answer on the grounds that it may tend to incriminate myself.

"Q. Mr. Solevo, did you ever, during that period of time, and in fact, up to this day, ever state to anyone that Mr. DeMartin was not the operator of the car, and that you were mistaken?

"A. I refuse to answer on the grounds that it may tend to incriminate myself.

"Q. And Mr. Solevo, when you testified in this court that you saw Mr. DeMartin walking with a cane—or when you saw Mr. DeMartin get out of a car with what, to you, looked like a cane, did you ever tell anyone, during that period of time, that that statement may not be true?

"A. I refuse to answer on the grounds it may tend to incriminate myself.

"Q. And when you testified on December 6th, that you went back to the restaurant and you spoke to someone in the restaurant and you asked 'Is Charlie walking with a cane?' did you ever state to anyone, since the date of your testimony, that that statement was not true; that you were mistaken?

"A. I refuse to answer on the grounds that it may tend to incriminate myself.

"Q. Mr. Solevo, when you testified on December 6th that you noticed somebody get out of a car, John Taddei, and that he walked over to the Cadillac where two guys were sitting, and that the door opened and Charlie jumped out, did you ever state to anyone, since the date of that testimony, that you were mistaken, and that statement was not true?

"A. I refuse to answer on the grounds that it may tend to incriminate myself.

"Q. And in response to a question on December 6th, wherein you answered that you saw a light colored car parked in front of a Cadillac, which the defendant, DeMartin, was in, did you ever state to anyone, since the date of that testimony, that that statement wasn't true; that the statement you gave in court was mistaken?

"A. I refuse to answer on the grounds that it may tend to incriminate myself.

"Q. Mr. Solevo, when you testified in court that the passenger door was open, and that Charlie jumped out, meaning Charlie DeMartin,

amendment privilege against self-incrimination. A testimonial waiver is "not lightly to be inferred." *Smith* v. *United States,* 337 U.S. 137, 150, 69 S. Ct. 1000, 93 L. Ed. 1264 (1949). It should be inferred only in the most compelling circumstances. *Klein* v. *Harris,* 667 F.2d 274, 288 (2d Cir. 1981). Vague and uncertain evidence will not support a finding

and a shotgun went up, did you ever tell anyone, since the date of that testimony, that that was not true, and that you were mistaken in your testimony in this court? . . .

"MR. LASALA: That's objected to. I move that be stricken.

"MR. DURHAM: He refused to answer any questions. I object to this entire line of questioning.

"THE COURT: Mr. Solevo, you don't intend to answer any questions?

"A. No, sir.

"THE COURT: According to the advice of counsel?

"A. Yes, sir.

"THE COURT: In all the questions that Mr. Costanzo intends to ask, you don't intend to answer any more questions?

"A. No, sir. . . .

"Q. You testified on December 6th or the 7th, that a person that you recognized as being my client, Frank Altrui, was driving that car. Did you ever state to anybody, since the date of your testimony, that that was not true, and that you were mistaken?

"A. I refuse to answer on the grounds it might tend to incriminate myself. . . .

"Q. You testified on December 6th or 7th, when you arrived at Gigi's in the company of Captain Iaguessa, that you saw my client, and that you identified my client as the driver of the car. Have you, since then, stated to anyone that that statement was not true, and that you were mistaken, and that you weren't sure of that identification?

"A. I refuse to answer on the grounds it may tend to incriminate myself. . . .

"Q. Mr. Solevo, I am showing you Defendant's Exhibit 1—

"MR. LASALA: State's Exhibit—

"Q. It's marked Defendant's Exhibit 1; would you look at that for me for a second, and tell me if, since the date of giving that statement, have you stated to anyone that the contents of that statement is not true, and that you were mistaken as to the contents and substance of that statement?

"A. I refuse to answer on the grounds it may tend to incriminate myself."

of waiver. *Rogers* v. *United States,* 340 U.S. 367, 377, 71 S. Ct. 438, 95 L. Ed. 344 (Black, J., dissenting), reh. denied, 341 U.S. 912, 71 S. Ct. 619, 95 L. Ed. 1348 (1951). Where a witness who has testified fully is recalled to the witness stand under a claim that he has recanted his prior testimony and thereafter upon inquiry the witness claims the privilege, the trial court must conduct a two-prong inquiry to determine waiver. Waiver can be inferred only "if (1) the witness' prior statements have created a significant likelihood that the finder of fact will be left with and prone to rely on a distorted view of the truth, and (2) the witness had reason to know that his prior statements would be interpreted as a waiver of the fifth amendment's privilege against self-incrimination." *Klein* v. *Harris,* supra, 287.

"Where . . . a witness' prior testimony results in a testimonial waiver of the witness' fifth amendment privilege, the trial judge must, if the witness is subsequently recalled to the stand, direct the witness to testify, if necessary under penalty of contempt. *Brown* v. *United States,* 356 U.S. 148, 154–57, 78 S. Ct. 622, 2 L. Ed. 2d 589 (1958). If the witness thereafter continues to refuse to testify, and if the refusal precludes the defendant from testing the truth of the witness' prior testimony, the trial judge must strike the prior testimony. *United States* v. *Cardillo,* 316 F.2d 606, 611 (2d Cir.), cert. denied, 375 U.S. 822, 84 S. Ct. 60, 11 L. Ed. 2d 55 (1963). The failure of the trial judge to take such corrective action deprives the defendant of his sixth amendment right of confrontation." *Klein* v. *Harris,* supra, 289.

Although superficially *Klein* would seem to apply to the case at bar, because the peculiar facts here

are light years away from *Klein* a different result is justified. Klein and his codefendant Rabinowitz were charged with the murder of one Diane Goodman, who was stabbed to death in her home. Rabinowitz, who told the police that Klein had done the stabbing, was permitted to plead guilty to a reduced charge of manslaughter. Klein, for his part, maintained that Rabinowitz had suddenly and unexpectedly killed Goodman while Klein was in an adjoining room. At the trial, Klein's trial counsel adopted the strategy of attempting to persuade the jury that it would be unfair to convict Klein of any offense greater than that to which Rabinowitz pleaded guilty. Klein's counsel, knowing of Rabinowitz's earlier statement to the police, nevertheless called him as a defense witness. Rabinowitz, without asserting a constitutional privilege, testified about the stabbing including a statement that he held the victim while Klein stabbed her.

After testifying, Rabinowitz was taken to the detention area. Klein's counsel also went to the detention area to speak with Klein. As Klein's counsel was leaving the area Rabinowitz stopped him and told him that under pressure from the assistant district attorney, he had lied on the stand, that, in fact, he and not Klein had actually killed Goodman. Thereafter when the defense called Rabinowitz to the stand and asked him a number of questions concerning the conversation in the detention area and about the events at the scene of the crime he refused to answer, invoking the privilege against self-incrimination. Rabinowitz, having by his later statement characterized his earlier statement as a patent falsehood, could not be permitted to leave that statement before the jury as the unblemished truth without impairing

the integrity of the judicial process. "It must be conceded that the privilege [against self-incrimination] is to suppress the truth, but that does not mean that it is a privilege to garble it; although its exercise deprives the parties of evidence, it should not furnish one side with what may be false evidence and deprive the other of any means of detecting the imposition. The time for a witness to protect himself is when the decision is first presented to him; he needs nothing more, and anything more puts a mischievous instrument at his disposal." *United States* v. *St. Pierre,* 132 F.2d 837, 840 (2d Cir. 1942), cert. dismissed as moot, 319 U.S. 41, 63 S. Ct. 910, 87 L. Ed. 1199 (1943); note, "Testimonial Waiver of the Privilege Against Self-Incrimination," 92 Harv. L. Rev. 1752, 1760 (1979).

The situation in this case presents an entirely different picture. After Solevo was visited by Kelsey, DeMartin's attorney called the assistant state's attorney and advised him that Solevo wanted to talk to the defense attorney. The prosecutor called Solevo immediately to find out what his intentions were and recorded the conversation. Solevo told the prosecutor (1) that he was caught between the [expletive] and the sweat; (2) that he didn't want to have to carry a gun home anymore; (3) that he had to live in [this] town; (4) that he couldn't go under the [expletive] strain; (5) that he couldn't take it any longer, he couldn't [expletive] take it and (6) that nobody could be with him as many hours as there is [sic]. At that point in the conversation, after being repeatedly asked by the prosecutor what it was that he was supposed to say, Solevo stated, "[m]aybe I made a mistake, maybe it wasn't Charlie DeMartin."

The defendants moved for a mistrial. "The general principle is that a mistrial should be granted only as a result of some occurrence upon the trial of such a character that it is apparent to the court that because of it a party cannot have a fair trial." *State* v. *Turcio,* 178 Conn. 116, 143, 422 A.2d 749 (1979). In passing on a motion for mistrial the trial court has a wide discretion. Ibid. If curative action less drastic is appropriate the court should take such action before terminating the trial. In view of the principle that waiver of the privilege against self-incrimination is not lightly to be inferred it is not at all clear that Solevo was not justified in claiming the privilege in this case. It is a fair inference that Kelsey attempted to tamper with a key state witness. Though justice may be blind it is not stupid. The mind of justice, not merely its eyes, would have to be blind to attribute such an occurrence to mere fortuity. *Avery* v. *Georgia,* 345 U.S. 559, 564, 73 S. Ct. 891, 97 L. Ed. 1244 (1953) (Frankfurter, J., concurring). Without further inquiry the defendants could not derive the benefit of a possible change of testimony obtained by questionable means. Had the defendants insisted on Solevo's testimony they could have pressed the claim of waiver before the trial judge in the absence of the jury. If upon inquiry the trial judge concluded that if Solevo persisted in the claim of privilege he would be obliged to strike Solevo's earlier testimony, then the prosecutor faced with the prospect of losing Solevo's testimony could have saved the testimony by granting Solevo immunity from prosecution. The defendants avoided this possibility by gaining the advantage of leaving with the

jury the impression that the earlier testimony was untrue without the jury learning about the circumstances under which the "recantation"[3] occurred.

This is not a case where the state attempted to offer evidence of tampering by Kelsey in order to show consciousness of guilt on the part of the defendants. Such evidence would be inadmissible without a further showing that Kelsey was acting at the request of the defendants or at least with their knowledge, consent or authorization. *State v. Sorbo,* 174 Conn. 253, 256, 386 A.2d 221 (1978); McCormick, Evidence (2d Ed.) § 273. Here the defendants seek to use tainted evidence as a basis for striking untainted evidence under a claim that to do otherwise would deny them their constitutional right of confrontation. Corruption of evidence—whether by bribery, intimidation, spoliation or the like—obstructs the discovery of truth by manufacturing or suppressing testimony. 3A Wigmore, Evidence (Chadbourne Rev.) § 956. The confrontation clause does not give the defendants a license to avail themselves of the benefits of tampering with the integrity of the judicial process.

---

[3] Solevo's "recantation" and assertion of fifth amendment privilege must be examined in light of the purposes of the confrontation clause. In cases where the witness-declarant has refused to testify or has suffered from an actual or feigned loss of memory it has been held that the affirmative admission of his prior inconsistent statements does not violate the defendant's confrontation right. See *United States v. Insana,* 423 F.2d 1165, 1170 (2d Cir.), cert. denied, 400 U.S. 841, 91 S. Ct. 83, 27 L. Ed. 2d 76 (1970) (prior inconsistent statements made to grand jury admitted where witness at trial conceded that loss of memory was due to desire not to hurt anyone); *United States v. Payne,* 492 F.2d 449, 452 (4th Cir.), cert. denied, 419 U.S. 876, 95 S. Ct. 138, 42 L. Ed. 2d 115 (1974) (unsworn statement of witness codefendant given to police officer where witness at trial professes lack of memory); *Johnson v. State,* 338 A.2d 124, 128 (Del. 1975) (statements of elderly rape victim given to police and treating physician of which she had no recollection at trial).

Had Solevo, when recalled, testified that he may have been or was mistaken in his earlier positive identification of DeMartin, the prosecutor would have been able, by the introduction of the tape recording, to show that Solevo had changed his testimony out of fear.

Kelsey was not a disinterested observer. He had known the codefendant Taddei for some twenty-five years. He also had a symbiotic relationship with him as evidenced by his becoming a willing receiver of answers signalled to him in the courtroom by Taddei while Kelsey was on the witness stand. Kelsey also knew DeMartin for some four to five years and frequently saw him at GG's Lounge. Solevo's sudden change of heart after being visited by Kelsey can hardly be attributed to coincidence. Solevo was being placed by Kelsey in a no-win situation. Unless he recanted his earlier testimony it is a fair inference that he feared he would be subjected to violence. If he did recant, on the other hand, he faced being prosecuted for having given false information to the police. General Statutes § 53a-180. In these circumstances the privilege against self-incrimination removed him from the horns of his dilemma. Whether he was entitled to assert the privilege in the circumstance is not free from doubt. A witness who testifies freely and voluntarily has a right to assume that he will not be intimidated to change his testimony. On the record before us, and applying the standard that waiver will not be inferred in the absence of compelling circumstances, we cannot conclude that Solevo had reason to know that his prior statements would be interpreted as a waiver of the fifth amendment privilege in a situation where he faced possible incrimination resulting from changes in tes-

timony produced by intimidation. We also cannot conclude that under the peculiar circumstances of this case permitting Solevo to exercise his fifth amendment privilege left the jury with a distorted view of the truth.[4]

DeMartin makes two claims. First, he claims that he was denied the right to cross-examine Solevo. This claim is without merit. Solevo was called as a witness by the defendant Altrui. When Solevo refused to answer any questions put to him by Altrui the trial court properly ruled that in the absence of any testimony from Solevo on direct examination there was nothing on which he could be cross-examined. "The purpose of . . . cross-examination is to test the credibility of the witness and the accuracy and reasonableness of his direct testimony." *Floyd* v. *Fruit Industries, Inc.,* 144 Conn. 659, 667, 136 A.2d 918 (1957). In the absence of direct *testimony* there is nothing to test. Second, insofar as DeMartin's motion for mistrial raises the constitutional issue involved in *Klein* v. *Harris,* supra, what we said above with respect to Altrui's claim applies with equal force to DeMartin.

## II

### State's Failure to Disclose

The conversation between Solevo and assistant state's attorney John Durham on January 1, 1980 was tape-recorded by Durham. On January 2, 1980 there was a conference in chambers following which Anthony Lasala, DeMartin's attorney, disclosed in open court that the day before he had received a

---

[4] By this decision we do not foreclose the defendants from demonstrating in a habeas corpus proceeding the factual foundation for the application of the *Klein* remedy.

call from someone, whose name he felt that he could not disclose because it came within the area of the attorney-client privilege, informing him that Solevo wanted to talk to him, that he immediately contacted the state's attorney's office and ultimately spoke to Durham, that he planned to talk to Solevo but because of the delicate nature of the situation would like to have the conversation in the presence of someone from the prosecutor's office. Durham disclosed that he had spoken to Solevo on January 1 but did not disclose at that time that the conversation had been tape-recorded. On January 22, 1980, some five days after Solevo refused to answer questions upon his being recalled to the witness stand, Durham disclosed to the defendants the contents of his tape-recorded conversation with Solevo. The defendants neither raised a claim of "suppression" of exculpatory information nor did they move the court for a continuance or for other relief.

It is a violation of due process for the prosecution to suppress material evidence favorable to the accused. *Brady* v. *Maryland,* 373 U.S. 83, 86, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963). To come within the strictures of *Brady,* however, it must appear (1) that the prosecution suppressed evidence after a request by the defense; (2) that the evidence was favorable to the defense and (3) that it was material. *Moore* v. *Illinois,* 408 U.S. 786, 794–95, 92 S. Ct. 2562, 33 L. Ed. 2d 706, reh. denied, 409 U.S. 897, 93 S. Ct. 87, 34 L. Ed. 2d 155 (1972). Although we may assume that at least superficially Solevo's statement was both favorable to DeMartin and material, because it was disclosed to the defendants during the trial it was not "suppressed" as that term is used in *Brady. State* v. *Olds,* 171 Conn. 395, 400, 370 A.2d 969 (1976). When the prosecutor

offered the taped conversation it was excluded upon objection by the defendants. Furthermore, the defendants requested neither a continuance nor the recall of any witnesses. Even if we assume that the taped conversation constituted *Brady* material and assume further that the twenty day delay was not justified it does not follow that the only appropriate sanction was either striking Solevo's earlier testimony or a mistrial. Whether acting wittingly or unwittingly defendants cannot decline to avail themselves of appropriate procedural motions at the trial at a time when curative action may be taken and then expect this court to afford them relief on appeal without making a clear showing of a denial of a fundamental constitutional right, in this case that the delay in disclosure deprived them of a fair trial. No such showing has been made here.

## III

### SUPPRESSION OF SEIZED EVIDENCE

The defendants claim that the court erred in denying their motions to suppress certain evidence seized from the Altrui car. In his brief DeMartin has limited his claim to the seized shotgun and bullets. Altrui for his part joined in the arguments in the DeMartin brief. To the extent that the defendants in their briefs did not pursue any claims with respect to other items seized[5] from the Altrui car they are considered abandoned. *Healy* v. *White*, 173 Conn. 438, 441, 378 A.2d 540 (1977).

DeMartin's claim of illegal search fails for lack of standing. DeMartin claims neither ownership

---

[5] The seized items consisted of a .12 gauge shotgun, a .38 caliber nickel-plated revolver, a spent .12 gauge shotgun shell and a live .38 caliber round.

nor a possessory interest in the Altrui car or in any of the seized items. Nor has he shown a reasonable expectation of privacy in the area alleged to have been searched. Absent such claim or showing standing does not exist. *State* v. *McLucas*, 172 Conn. 542, 546, 375 A.2d 1014, cert. denied, 434 U.S. 855, 98 S. Ct. 174, 54 L. Ed. 2d 126 (1977). Standing does not exist even though the accused is the target of the search; *Rakas* v. *Illinois*, 439 U.S. 128, 135, 99 S. Ct. 421, 58 L. Ed. 2d 387 (1978), reh. denied, 439 U.S. 1122, 99 S. Ct. 1035, 59 L. Ed. 2d 83 (1979); or because a third person's privacy has been invaded; *Alderman* v. *United States*, 394 U.S. 165, 174, 89 S. Ct. 961, 22 L. Ed. 2d 176 (1969); or on some automatic basis[6] because of having been charged with a possessory crime. *United States* v. *Salvucci*, 448 U.S. 83, 100 S. Ct. 2547, 65 L. Ed. 2d 619 (1980).

With respect to Altrui's claim, there is no issue with respect to standing since the car belonged to Altrui. However, the state justifies the seizure of the shotgun and bullets under the "plain view" doctrine. The test for plain view seizures requires (1) that the police intrusion which leads up to the view must be legal; (2) that the discovery of the evidence must be inadvertent; and (3) that the police must have probable cause to believe there is a reasonable relation between the evidence seized and the criminal behavior under investigation. *Coolidge* v. *New Hampshire*, 403 U.S. 443, 466, 91 S. Ct. 2022, 29 L. Ed. 2d 564, reh. denied, 404 U.S. 874, 92 S. Ct. 26, 30 L. Ed. 2d 120 (1971); *State* v. *Federici*, 179 Conn. 46, 56, 425 A.2d 916 (1979). The

---

[6] In view of *Salvucci*, what we said respecting automatic standing in *State* v. *Perez*, 181 Conn. 299, 303–304, 435 A.2d 334 (1980), and *State* v. *Paoletto*, 181 Conn. 172, 177, 434 A.2d 954 (1980), is no longer controlling.

state argues, and Altrui does not question, that the police had probable cause to seize and impound the black Cadillac as evidence in connection with the crimes against Solevo. The state also argues that the police had a right to have the car towed to the police station and that if, in the course of disengaging the front-wheel drive, the tow operator had to enter the vehicle he had a right to do so whether he did it on his own initiative or at the direction of the police and that whatever fell into plain view when he opened the door was subject to seizure by the police if there were reasonable grounds for believing a causal connection between the seized items and the criminal behavior under investigation. Altrui, for his part, argues that this case does not come within the plain view doctrine because the sighting of the seized items was not inadvertent.

Although there is a basis for application of the plain view doctrine to this case, the shotgun and bullets were properly seized in any event. "One of the circumstances in which the Constitution does not require a search warrant is when the police stop an automobile on the street or highway because they have probable cause to believe it contains contraband or evidence of a crime." *Arkansas* v. *Sanders,* 442 U.S. 753, 760, 99 S. Ct. 2586, 61 L. Ed. 2d 235 (1979). Based on the information that DeMartin and Altrui and Altrui's car had been involved in the shooting, that a shotgun had been used, that a shotgun shell wadding was found at the scene of the shooting, that a short time elapsed between the shooting and initial detention of the defendants and that when the Altrui car was located at the rear of a restaurant only DeMartin and Altrui were near it, there was sufficient probable cause to believe that the weapon which had been

used in the shooting was still in the vehicle. This would have afforded a sufficient basis for a search of the automobile without a warrant. *United States* v. *Ross,* 456 U.S. 798, 102 S. Ct. 2157, 72 L. Ed. 2d 572 (1982).

## IV

### Ex Parte Communication by Judge with Juror

During the trial, on January 3, 1980, a third party gave to Stephen Campbell, a member of the jury, an article in a local newspaper[7] which related to the trial and to Campbell's status as a juror. The same day Campbell met privately with the trial judge who spoke to him and allowed him to read the article but specifically told him not to discuss this article with any of the other jurors. Later Campbell advised all parties that he had followed the court's instructions and had not discussed his situation with the other jurors. On January 4, 1980, on motion by the state, Campbell was excused from further service. Both defendants objected to the state's motion claiming that excusing the juror would not be curative. Thereafter the defendants moved for a mistrial "on the basis of an article that appeared in the New Haven *Register* today . . . ." (Emphasis added.)

In *State* v. *McCall,* 187 Conn. 73, 81–82, 444 A.2d 896 (1982), we explicitly stated what we had alluded to in *Aillon* v. *State,* 168 Conn. 541, 545–46, 363 A.2d 49 (1975) and *State* v. *Hackett,* 182 Conn. 511, 522–23, 438 A.2d 726 (1980) namely, that "[e]x *parte communications between judge and juror are constitutionally prohibited because the judge's*

---

[7] The article in question discussed a problem Campbell was having with his employer. It also discussed evidence disclosed during the hearing on the defendants' motion to suppress.

*statements may affect the jury's impartiality."* (Emphasis added.) "The theory of our system is that the conclusions to be reached in a case will be induced only by evidence and argument in open court, and not by any outside influence, whether of private talk or public print." *Patterson* v. *Colorado,* 205 U.S. 454, 462, 27 S. Ct. 556, 51 L. Ed. 879 (1907). Thus in every criminal case, if the trial judge communicates ex parte with the jury, whether before or during deliberations, however innocuous the communication may be reported to be, prejudice will be presumed and the burden will thereupon shift to the state to show that the communication was harmless beyond a reasonable doubt. *State* v. *McCall,* supra, 82.

On the record before us, because the juror was excused and because he stated that he followed the judge's instructions and had not discussed his situation with the other jurors and because, despite the fact that the defendants were permitted to examine Campbell on this aspect of the case, there is no evidence to the contrary, we conclude that the trial court's error was harmless beyond a reasonable doubt.[8] *Chapman* v. *California,* 386 U.S. 18, 24, 87 S. Ct. 824, 17 L. Ed. 2d 705, reh. denied, 386 U.S. 987, 87 S. Ct. 1283, 18 L. Ed. 2d 241 (1967).

There is no error.

In this opinion the other judges concurred.

---

[8] Although during Campbell's examination he related that on January 2, 1980 one juror had told him about reading the offending article and another about hearing a radio broadcast about the trial, neither of these incidents was causally related to Campbell's private conversation with the trial judge.