CHARLES DeMARTIN *v.* JOHN R. MANSON,
COMMISSIONER OF CORRECTION
(2478)
(2479)

DANNEHY, C.P.J., HULL and DUPONT, Js.

Argued May 2—decision released September 4, 1984

*David M. Reilly,* for the appellant (plaintiff).

*Robert J. Devlin, Jr.,* assistant state's attorney, with whom was *Arnold Markle,* state's attorney, for the appellee (defendant).

HULL, J. The principal issue presented by this appeal is whether the court erred in finding that it could not infer that a witness, who invoked the fifth amendment privilege against self-incrimination when he was recalled to the stand, had waived the right to claim the privilege by virtue of his prior testimony. We find no error.

On February 20, 1980, a jury convicted the plaintiff, Charles DeMartin, on all counts of a five count substitute information charging criminal attempt to commit assault in the first degree, conspiracy to commit assault in the first degree, reckless endangerment in the first degree, possession of weapons in a motor vehicle, and possession of a shotgun in a motor vehicle. The plaintiff was sentenced to imprisonment for an effective term of not less than six nor more than twelve years. His conviction was upheld by the Supreme Court on August 17, 1982. *State* v. *Altrui,* 188 Conn. 161, 448 A.2d 837 (1982).[1] Thereafter, on November 22, 1982, the plaintiff filed two applications for writs of habeas corpus in the Superior Court for the judicial district of Hartford-New Britain.[2] The defendant filed a motion to quash the first petition. This motion was granted by the court. The court then held a hearing on the second petition. After the hearing, the plaintiff's petition was denied and the trial judge, *N. O'Neill, J.,* certified the case for appeal to this court.[3] The detailed facts of this case are set forth in *State* v. *Altrui,* supra.

The plaintiff claims on appeal that he was denied his right to due process and the right to confront witnesses against him in violation of the fifth, sixth and fourteenth amendments to the constitution of the United States when the trial court permitted a witness, the victim, Michael Solevo, to invoke the privilege against self-incrimination.

[1] Frank Altrui was a codefendant in the trial.

[2] The plaintiff first sought a writ of habeas corpus in the United States District Court which dismissed the application, refusing to retain jurisdiction where the petitioner had not exhausted available remedies in state court. The United States Court of Appeals for the Second Circuit affirmed that decision.

[3] The plaintiff also filed an appeal, appeal No. 2478, from the granting of the motion to quash. The motion to join the two appeals was granted by the court.

The facts pertinent to this appeal are as follows: Michael Solevo, the victim of the shooting incident in the underlying case, identified DeMartin as one of the perpetrators of the crimes. At trial, Solevo was called as a witness for the state. He gave extensive testimony regarding DeMartin's involvement in the crimes charged during direct examination on December 6 and 7, 1979, and on cross-examination on December 11, 12 and 13. On January 17, 1980, Solevo was called as a witness by DeMartin's codefendant, Frank Altrui. During direct examination, Solevo exercised his fifth amendment privilege in response to twelve specific inquiries by defense counsel.[4]

In the habeas corpus proceedings, the court heard extensive evidence concerning the circumstances surrounding this chain of events. On January 1, 1980, DeMartin's attorney contacted the state's attorney and claimed that Solevo wished to talk to the attorneys in the case because of an alleged desire to recant his prior story. The state's attorney promptly contacted Solevo by telephone in order to discover Solevo's intentions regarding his testimony. That conversation was recorded. In that telephone conversation, Solevo told the prosecutor, "I gotta live in this town . . . you know I'd like to make amends to everybody and live in this town, and work and run my business without bothering anybody, not have to worry about carrying a gun going home at night . . . OK. There's nobody that can be with me as many hours of the day that there is."[5]

The habeas court also considered testimony concerning a conversation Solevo had on January 2, 1980, with

---

[4] A verbatim recitation of the direct examination and the witness' response is printed in *State* v. *Altrui*, 188 Conn. 161, 167–69 n.2, 448 A.2d 837 (1982).

[5] The Supreme Court included a detailed account of the recorded telephone conversation of January 1, 1980, in *State* v. *Altrui*, 188 Conn. 161, 172, 448 A.2d 837 (1982).

assistant state's attorney John Durham and inspector
Bruce Piggott.[6] The court found that this conversation,
as well as the conversation of January 1, indicated that

[6] The text of the conversation as printed in the memorandum of decision
is as follows: "JD: Well, the unfortunate part at this point is that there
is, you know, there's no easy way out. I mean, you're jammed up either
way, uh, you know, you gave the police a truthful statement, you testified
in court under direct and cross-examination and told the truth. So, you know,
to think that now, uh, you're gonna be able, that DeMartin, Altrui and uh,
Taddei and that crew is gonna get off your back and everything is going
to be roses if all you [do] is go in and uh, recant and perjure yourself is,
that's not the way it is. Because they can do it, I mean from my perspec-
tive, if they can do it to you, they can do it to the next little store owner
that they're trying to shake down, and the next little restaurant owner and
anybody else they want to shake down. All they've gotta do is put the pres-
sure on and continue to do exactly what they're doing.

"Now, I'd sit down, if I were you, I would sit down with my attorney,
tell him what you know, tell him what the truth is, tell him what it is that
you suspect they want you to say, tell him you testified to the court and
gave the statement to the police and ask him, ask him where you stand.

"MS: He said, I uh, I asked him all that and he says you'd probably be
arrested for perjury. And perjury's five years, Right?

"JD: Perjury's a felony in Connecticut, yeah.

"MS: He said, you know, you'll end up in court yourself and there's no
way in saying that somebody's gonna believe you, you'll probably both end
up in jail together.

"JD: Well, that's largely a decision for you and your attorney, all I'm
saying is that I know that you told the cops the truth, I know you told the
jury the truth, and uh—

"MS: Oh, boy, you know. Who's gonna be with me in seven, six, seven
years when these characters are out on the street. You know what I mean?
Now, what if, if there, if it wasn't meant for me, they were drinking wine
all day—

"JD: I know, you know, I would suspect . . . .

"MS: If I probably didn't walk out of there, he probably would have got
in this car and drove away again.

"JD: Maybe. But you did walk out and he did shoot at you. That's against
the law and he could have killed you. And then where would your wife and
kids and your family be?

"MS: My mother, I didn't know this until today, my mother had a meet-
ing all set up with Charlie, to straighten this all out, and my brother made
her cancel out, he said, No, don't you dare get involved again.

"BP: Who's that?

"MS: Franny.

"BP: Franny.

"MS: [inaudible] My mother had a meeting with, through somebody else,

Solevo was extremely upset and was afraid that he and his family would suffer repercussions as a result of his testimony. On January 11, 1980, DeMartin moved for

she said something [inaudible]. But, I definitely would get arrested for perjury, huh?

"JD: I don't mean, I don't know, I don't want to tell you what to do. Talk to your attorney. Tell LaSala what the situation is. I mean, LaSala's not going to make you testify, if uh, if you tell him that what you testified to before was the truth and now you're just jammed up on all this stuff. Tell him the truth.

"MS: Well, he was supposed to come in the restaurant at 12:00 today and talk to me, then he called up and said he couldn't make it. He wanted me to go to his office at 5:30. I said I can't come out there. I don't even have a car. I took my mother's car down here. I parked in the parking lot, by the way that's good?

"JD: Where's your attorney's office?

"MS: Temple Street. It's up the street from the Sheraton Park Plaza.

"JD: Do you want to call him, see if you can get a hold of him, or do you want to just, uh, I mean, it's up to you, whatever, uh, whatever you and your attorney think.

"MS: Well, he's sorta advised me to, uh, not to, uh, not to, not to do that. He said, you're opening yourself up for an arrest, and [inaudible]—Can't get a goddam gun permit. I don't, you know, I'm gonna be open. I'm a sitting duck behind a [deletion] bar with two windows, door window, and uh, and I gotta put up with clowns trying to make a name for themselves now, you know what I mean? You know what I mean? You know, just the nobody's that, that, maybe when they were 18, 19 years old, they were strong guys, now they drink, they got fat [deletion] bellies.—Well, isn't it almost over, this case now?

"JD: That's why, that's why, that's why they're putting the pressure on. Because they know they've got problems. I mean, we've got the guns, the Motion to Supress the guns was denied, uh, we went through a full day's hearing on Chain of Custody on the guns, they know, as a matter of fact, the guns came in today, you know. They've got problems, it's getting down to the nitty-gritty, it's positive identification, you know them, we get the car a short time later with DeMartin and Altrui, we got the guns, we got the shotgun wad.

"MS: You know, if I got on that stand, who would, the jury wouldn't believe me anyway. They'll probably get sentenced anyway and I'd get arrested for perjury. I don't know what [deletion] to do, John, I tell you. . . .

"JD: Were they any of Taddei's construction union people?

"MS: No, no, he has his own construction company. And I'm not, I'm not the type of guy that gets scared. I'm scared, not for me, I'm scared

acquittal. During the hearing on the motion, no mention was made of the possibility that Solevo had recanted or desired to recant. On January 16, DeMartin rested his case, again without any mention of Solevo's alleged desire to recant earlier testimony. On January 17, 1980, Solevo was called as a witness by Altrui, at which time Solevo invoked the privilege against self-incrimination in response to questions concerning his prior testimony and the conversations of January 1 and 2. Solevo was not offered immunity by the state and the trial judge did not order him to testify. DeMartin thereafter moved for a mistrial. Again, he offered no evidence that Solevo wished to recant. Furthermore, DeMartin did not move to strike Solevo's prior testimony from the record. The motion for a mistrial was denied.

On January 18, 1980, Altrui called Kent Kelsey as a witness. Kelsey testified that Solevo had indicated to him that he was confused and was not sure about the events which occurred during the shooting incident and that he did not think DeMartin was involved. The habeas court found that Kelsey's testimony was "unbelievable" and that "apparently the jury thought so."[7] The habeas court concluded that there was no evidence of any bribery of Solevo or that Solevo had recanted or wished to. The court found "that Solevo was in fear

---

for my wife, my kids and the poor [deletion] people sitting in the restaurant.—Well, what can I tell LaSala?

"BP: The truth.

"MS: I'm scared? I want to, I want to change my mind.

"BP: The truth. . . .

"MS: They'll be on the street in a year and a half, two years and poor Mike will be in big trouble. There's too many of them, they're too deep, John. You, or I, or Bruce, no matter what we say or do.

"JD: Well, what are you going to do. Take it day by day, all right.

"MS: All right."

[7] The Supreme Court indicated in *State* v. *Altrui*, 188 Conn. 161, 166, 175, 448 A.2d 837 (1982), that Kelsey had known the defendants for lengthy periods of time and that "Solevo's sudden change of heart after being visited by Kelsey can hardly be attributed to coincidence."

before and during the trial and infers coercion from that fear." The court's inference was based not only on the fact that Solevo had already been shot at with a shotgun, but also upon what transpired during the two conversations between Solevo and members of the prosecutor's office.

The Supreme Court stated in *State* v. *Altrui,* supra, 176, that it could not "conclude that under the peculiar circumstances of this case permitting Solevo to exercise his fifth amendment privilege left the jury with a distorted view of the truth," but went on to say in footnote four; id., 176 n.4; that this conclusion did not foreclose DeMartin from demonstrating in a habeas corpus proceeding the factual foundation for an application of the remedy which permits a court to find a waiver of the privilege under certain circumstances.

The test for determining whether a court may infer a testimonial waiver of the privilege against self-incrimination is set forth in *Klein* v. *Harris,* 667 F.2d 274, 287 (2d Cir. 1981). A testimonial waiver is not to be inferred lightly. *Smith* v. *United States,* 337 U.S. 137, 150, 69 S. Ct. 1000, 93 L. Ed. 2d 1264 (1949); *State* v. *Altrui,* supra, 169. It should be inferred only under the most compelling circumstances. *Klein* v. *Harris,* supra, 288; *State* v. *Altrui,* supra. The two-prong test set forth in *Klein* v. *Harris,* supra, 287, states: "[A] court should only infer a waiver of the fifth amendment's privilege against self-incrimination from a witness' prior statements if (1) the witness' prior statements have created a significant likelihood that the finder of fact will be left with and prone to rely on a distorted view of the truth, and (2) the witness had reason to know that his prior statements would be interpreted as a waiver of the [privilege] . . . ." The second prong of the *Klein* test requires a two-fold analysis.

The requisite "reason to know" that a waiver might be inferred should be found *only if* the witness' *prior* statements were (a) testimonial, meaning that they were voluntarily made under oath in the context of the same judicial proceeding, *and* (b) incriminating, meaning they did not merely deal with matters collateral to the events surrounding the commission of the crime, but directly inculpated the *witness* on the charges at issue. *Klein* v. *Harris,* supra, 288.

Both prongs of this test must be satisfied in order for the court to be able to infer a testimonial waiver. The habeas court found, as did the Supreme Court in *State* v. *Altrui,* supra, 176, that the first prong of the test was not satisfied because permitting Solevo to invoke the privilege did not leave the jury with a distorted view of the truth. In this regard, the habeas court stated: "In examining the entire record of the original trial, and all the exhibits and after an exhaustive trial in this court, it cannot be found that Solevo's statements on direct and cross-examination created a significant likelihood that the jury would be left with and prone to rely on a distorted view of the truth. In particular, in the trial in this court, it became abundantly clear that Solevo's statements in his original testimony and cross-examination were the truth as they were convincingly supported by his mother's testimony which the court found accurate and credible. The court neither heard nor saw any believable evidence contradicting Solevo or his mother."

As concerns the second prong of the test, the habeas court found that Solevo's prior statements were both testimonial and incriminating. The court found that the statements were incriminating because they directly inculpated the witness on the charges at issue and found that the charges at issue were either giving false testimony or committing perjury in the event the statements were untrue. We disagree. The statements were

not "incriminating" as this term is defined for the purposes of applying the *Klein* test. We construe "directly inculpated the witness on the charges at issue" to mean those charges which stem from and are directly related to the "events surrounding commission of the crime." See *Klein* v. *Harris,* supra, 288. Solevo's prior testimony concerned the events surrounding the commission of the crime, but clearly there was nothing self-incriminating to Solevo in that testimony as to his involvement in the crimes charged. See *United States* v. *James,* 609 F.2d 36, 45 (2d Cir. 1979); *State* v. *Valeriano,* 191 Conn. 659, 667, 468 A.2d 936 (1983).

In any event, the first prong of the test was not found to be satisfied and, therefore, a testimonial waiver could not be inferred. Any erroneous interpretation of the term "incriminating," therefore, was harmless error. The court correctly found that a testimonial waiver could not be inferred under the circumstances of this case. The factual basis for applying the *Klein* remedy has been exhaustively explored. The requisite "significant danger of distortion"; *Klein* v. *Harris,* supra, 288; and necessary compelling circumstances for finding a testimonial waiver are absent here.

The plaintiff also claims that he was denied his right to confrontation by virtue of the trial court's decision to permit Solevo to invoke the privilege. As the Supreme Court succinctly stated in *State* v. *Altrui,* supra, 176, in the absence of any direct testimony, there is nothing to test through cross-examination. By refusing to answer, there was no direct testimony. The petitioner had ample opportunity to cross-examine the witness at the time of his original testimony and to call Solevo as his own witness at trial. See *United States* v. *Calvente,* 722 F.2d 1019, 1024 (2d Cir. 1983). Furthermore, it is clear that where there is a direct conflict between the accused's right to compel testimony and a witness' privilege against self-incrimination, "the accused's right

to compel testimony must give way to the witness' privilege against self-incrimination . . . ." *State* v. *Simms*, 170 Conn. 206, 209, 365 A.2d 821 (1976); see *Kastigar* v. *United States*, 406 U.S. 441, 444–45, 92 S. Ct. 1653, 32 L. Ed. 2d 212 (1972).

There is no error on the plaintiff's appeal No. 2479.

As to the plaintiff's appeal from the judgment granting the motion to quash the first petition, the issues, claims and allegations presented in the second petition substantially incorporated and, therefore, duplicated those presented in the first petition. That appeal is now moot in light of the full consideration given to the second petition.

Appeal No. 2478 is dismissed for mootness.

In this opinion the other judges concurred.