STATE OF CONNECTICUT *v.* PHILLIP PAOLETTO

STATE OF CONNECTICUT *v.* GONZALO GONZALEZ

COTTER, C. J., LOISELLE, BOGDANSKI, PETERS and HEALEY, Js.

Argued March 5—decision released June 10, 1980

*Bruce A. Sturman,* assistant public defender, with whom, on the brief, was *Joette K. Rubin,* assistant public defender, for the appellants (defendant in each case).

*Ernest J. Diette, Jr.,* assistant state's attorney, with whom, on the brief, were *Donald A. Browne,* state's attorney, and *Frank S. Maco,* assistant state's attorney, for the appellee (state).

LOISELLE, J.  The defendants were convicted by a jury of six of larceny in the first degree in violation of General Statutes §§ 53a-119 and 53a-122 (a) (2) and burglary in the second degree in violation of General Statutes § 53a-102 (a) in connection with a housebreaking and theft of personal property in Stamford.  The defendants have appealed from the judgment[1] rendered thereon.

The facts of the case can be summarized as follows: On April 15, 1977, at approximately 10 p.m., Officer Patrick Murphy of the Stamford police department was assisting the investigation of a traffic accident in a "well-to-do" residential area of

---

[1] On June 28, 1979, this court granted the defendants' motion to combine their cases on appeal and to present one brief and one oral argument.

Stamford. While directing traffic, he observed a black Ford automobile approaching at a rate in excess of the posted speed limit. The driver accelerated upon spotting the police officer, which led Murphy to believe he was taking evasive action. Since Murphy always watched vehicles in that area of town at this time of night, his curiosity was aroused and he gave chase. He told his fellow officer, "I don't think you need me. I think I got something going with this vehicle in the area it is in. And due to the rate of speed, he appears to be taking off. I am going to pursue the vehicle." The other officer remarked that one of the occupants in the rear seat ducked down when the car passed.

When Murphy discerned the marker number of the car, his curiosity turned to suspicion. This number had been listed by the police department in the past as a suspicious motor vehicle in this area of Stamford.[2] Moreover, Murphy recognized the car as one which belonged to a Stamford resident. He knew the woman who owned the car and knew her son, Dominick Fabricatore, whom he had stopped once or twice for minor incidents while driving the Ford. When the driver turned north on West Hill Road, Murphy knew that the car and driver were headed away from home, "out of his element," and thought that the driver was attempting to "give me the brush-off." He activated his red light and siren and the driver of the Ford promptly pulled over. Murphy radioed headquarters for assistance.

---

[2] This area of Stamford was designated a "high crime area" by the police department because approximately seven to ten burglaries per day had occurred there within a three mile radius. Officer Patrick Murphy had participated in the investigation of approximately fifty to seventy burglaries prior to this incident.

Fabricatore immediately alighted from his auto-mobile, closed the door and approached Murphy to offer his operator's license. Murphy asked for his registration. When Fabricatore returned to the car and opened the door and the glove compartment to get it, Murphy shone his spotlight at the glove compartment where he saw a screwdriver. Murphy took Fabricatore to the police cruiser and placed him in the back seat. When he asked Fabricatore who the passengers were, Fabricatore answered Gonzalez, Paoletto and Johnson. Murphy returned to the Ford alone, looked through the window and observed a pry bar in plain view on the floor in front of the back seat. He reached in through the door left open by Fabricatore and seized the pry bar. Murphy returned to the cruiser and asked Fabricatore to open the trunk. He responded that the trunk was empty, that he had no key and that Murphy had no right to search the trunk. Murphy then arrested Fabricatore for possession of bur-glar's tools.

Shortly thereafter, a police sergeant and two other officers from the burglary division arrived on the scene. One of the officers properly identified the third passenger in the car as Wayne Green,[3] and not Johnson as Fabricatore had told Murphy. The sergeant advised Murphy that he believed there was probable cause to search the car. All three passen-gers were arrested for possession of burglar's tools and placed in separate vehicles. The sergeant and the officers then proceeded to search the Ford. The officers found a screwdriver and two pair of gloves under the driver's seat, a clothes basket in the back

[3] Wayne Green, the third defendant at trial, was also convicted of first degree larceny and second degree burglary and sentenced to two five-to-ten-year concurrent terms but chose not to appeal.

seat, and numerous items, later identified by the victims of a housebreak, in the trunk to which the officers gained access by removing the back seat and back rest. The officers summoned a tow truck which towed the Ford to the police station.

All four suspects were taken to the police station. From there Fabricatore accompanied a police detective and a sergeant of the burglary and robbery squad to the residence of C. David Baer where the three entered through an open rear door. The police officers took pictures of the ransacked house which were later introduced into evidence. The sergeant then drove Fabricatore back to the police station where he made a written statement. Fabricatore testified for the state at trial.

The defendants raise three claims of error concerning violation of their rights upon search and seizure and arrest. They claim: (1) that the assertion of fourth amendment rights by them as passengers in Fabricatore's automobile has not been foreclosed by *Rakas* v. *Illinois,* 439 U.S. 128, 99 S. Ct. 421, 58 L. Ed. 2d 387 (1978), reh. denied, 439 U.S. 1122, 99 S. Ct. 1035, 59 L. Ed. 2d 83 (1979); (2) that Murphy's stopping of the automobile was pretextual and unreasonable under the fourth amendment to the United States constitution; and (3) that Murphy did not have probable cause to arrest Fabricatore for possession of burglar's tools. We address each of these claims in turn.

The trial court denied the defendants' motion to suppress evidence seized from the car after a hearing on the motion in October, 1977. The defendants excepted to the court's ruling to preserve their fourth amendment claims for appeal. On appeal the state claims that the defendants, as mere passen-

gers in a vehicle belonging to another, have no standing to assert a fourth amendment violation concerning the search of that vehicle because under *Rakas,* supra, decided in 1978, the defendants had no legitimate expectation of privacy in the automobile, the glove compartment, the area under the front seat, or the trunk. Although the facts are similar, *Rakas* does not deny the defendants standing in this case. As the United States Supreme Court noted in *Rakas,* supra, 135 n.4, the rule of automatic standing to contest an allegedly illegal search where the same possession needed to establish standing is an essential element of the offense charged, which was established in *Jones* v. *United States,* 362 U.S. 257, 80 S. Ct. 725, 4 L. Ed. 2d 697 (1960), has not been overruled.[4] Here the defendants were charged in separate informations which alleged first degree larceny and second degree burglary. Although the statutory definitions of these crimes do not specify "possession" as an essential element,[5] the defendants' motion for a bill of particulars was denied and the prosecutor stated at

[4] This court recognized the automatic-standing rule of *Jones* v. *United States,* 362 U.S. 257, 80 S. Ct. 725, 4 L. Ed. 2d 697 (1960), upheld in *Brown* v. *United States,* 411 U.S. 223, 93 S. Ct. 1565, 36 L. Ed. 2d 208 (1973), in *State* v. *McLucas,* 172 Conn. 542, 546–47, 375 A.2d 1014, cert. denied, 434 U.S. 855, 98 S. Ct. 174, 54 L. Ed. 2d 126 (1977).

[5] General Statutes § 53a-119 provides: "LARCENY DEFINED. A person commits larceny when, with intent to deprive another of property or to appropriate the same to himself or a third person, he wrongfully takes, obtains or withholds such property from an owner. . . ." Section 53a-122 provides: "LARCENY IN THE FIRST DEGREE: CLASS B FELONY. (a) A person is guilty of larceny in the first degree when: . . . (2) the value of the property or service exceeds two thousand dollars. . . ."

General Statutes § 53a-102 provides: "BURGLARY IN THE SECOND DEGREE: CLASS C FELONY. (a) A person is guilty of burglary in the second degree when he enters or remains unlawfully in a dwelling at night with intent to commit a crime therein. . . ."

the suppression hearing that the state was proceeding on a theory of larceny by possession.[6] It is true that at the time the suppression hearing was held, *Rakas* had not yet been decided. But even the prosecutor conceded that on the state's theory of the case the automatic-standing rule of *Jones* accorded the defendants the right to challenge the legality of the search. Because the rule of standing established in *Jones* survives *Rakas*,[7] we review the defendants' fourth amendment claims.

The defendants claim that the court erred in denying their motion to suppress evidence seized from the car because the stop of the car was pretextual and unreasonable under the fourth amendment to the United States constitution and under *Delaware* v. *Prouse*, 440 U.S. 648, 99 S. Ct. 1391,

---

[6] After defense counsel asserted defendants' standing to raise fourth amendment claims, the court addressed the state's attorney.

"The Court: What do you have to say?

Mr. Maco: I have nothing to say insofar as the standing of each of these defendants. I have nothing to say with regard to the standing of each of them, but I am interested to hear whatever counsel has to offer with regard to any illegality of the subsequent search. *Jones* versus the *U.S.*, Your Honor, is a proposition stating that one with whom the state charges a possessory crime cannot be then argued by the state not to have standing to argue against it. I believe that is with regard to such instances as narcotics possession. In this case we are charging larceny, possession of stolen goods that will come forth. . . .

The Court: Now, if I understand your position, Mr. Maco, you raise no objection to the fact that Mr. Naples' client, Mr. Green, has a standing to object, to make the objection that he has?

Mr. Maco: Correct.

The Court: At this time.

Mr. Maco: At this time, Your Honor. . . ."

[7] Although we acknowledge that this aspect of *Jones* v. *United States*, 362 U.S. 257, 80 S. Ct. 725, 4 L. Ed. 2d 697 (1960), survives *Rakas* v. *Illinois*, 439 U.S. 128, 99 S. Ct. 421, 58 L. Ed. 2d 387 (1978), *Rakas* clearly established the rule that fourth amendment rights are personal rights which may not be asserted vicariously. *Rakas*, supra, 133–34.

59 L. Ed. 2d 660 (1979).[8] In *Delaware* v. *Prouse,* supra, 663, the court held that "except in those situations in which there is at least articulable and reasonable suspicion . . . that either the vehicle or an occupant is otherwise subject to seizure for violation of law, stopping an automobile and detaining the driver in order to check his driver's license and the registration of the automobile are unreasonable under the Fourth Amendment." In *Delaware* v. *Prouse,* supra, the patrolman testified that he had not observed any traffic or equipment violations or any suspicious activity before stopping the defendant's vehicle, and that the only reason he made the stop was to check the driver's license and registration. The patrolman explained, " 'I saw the car in the area and wasn't answering any complaints, so I decided to pull them off.' " Id., 650–51. By comparison, the stop of the Fabricatore vehicle in this case was hardly the type of random spot-check of motor vehicles held unconstitutional in *Delaware* v. *Prouse.*[9] The conduct of the defendants and Fabricatore, the driver, as recited above, provided Murphy with an articulable and reasonable suspicion that the vehicle and its occupants were subject

---

[8] Article first, § 7, of the Connecticut constitution provides the same protection against unreasonable search and seizure as the fourth amendment to the United States constitution. *State* v. *Watson,* 165 Conn. 577, 584, 345 A.2d 532 (1973).

[9] The United States Supreme Court remanded *State* v. *Kretchmar,* 201 Neb. 308, 267 N.W.2d 740 (1978), for reconsideration in light of *Delaware* v. *Prouse,* 440 U.S. 468, 99 S. Ct. 1391, 59 L. Ed. 2d 660 (1979). *Nebraska* v. *Kretchmar,* 440 U.S. 978, 99 S. Ct. 1783, 60 L. Ed. 2d 237 (1979). The stop in that case resulted from "an intuitive feeling on the part of the trooper that the driver of the vehicle did not fit the late model vehicle he was driving, and that a check should be made to ascertain whether or not the vehicle might possibly have been stolen." *State* v. *Kretchmar,* supra, 310. This officer proceeded upon less articulable and reasonable a suspicion than Officer Murphy in this case.

to seizure for violation of the law; *Delaware* v. *Prouse*, supra, 663; and justified the stop for investigative purposes. *Adams* v. *Williams*, 407 U.S. 143, 146, 92 S. Ct. 1921, 32 L. Ed. 2d 612 (1972); *State* v. *Hoffler*, 174 Conn. 452, 457–59, 389 A.2d 1257 (1978); *State* v. *Acklin*, 171 Conn. 105, 110–11, 368 A.2d 212 (1976); *State* v. *Watson*, 165 Conn. 577, 584–85, 345 A.2d 532 (1973).

The defendants also claim that there was no probable cause to arrest them for possession of burglar's tools in violation of General Statutes §53a-106.[10] Police officers may arrest without a warrant "any person for any offense in their jurisdiction, when such person is taken or apprehended in the act or on the speedy information of others . . . ." General Statutes § 54-1f (formerly § 6-49). The issue before the court is whether Murphy, when he stopped the Fabricatore vehicle, had probable cause to believe that the defendants were engaged in a violation of § 53a-106. "Probable cause means more than mere suspicion. There must be facts and circumstances within the officer's knowledge, and of which he has trustworthy information, sufficient to justify the belief of a reasonable person that an offense has been or is being committed." *State* v. *Penland*, 174 Conn. 153, 155, 384 A.2d 356, cert. denied, 436 U.S. 906, 98 S. Ct. 2237, 56 L. Ed. 2d

[10] General Statutes § 53a-106 provides: "MANUFACTURING OR POSSESSION OF BURGLAR'S TOOLS: CLASS A MISDEMEANOR. (a) A person is guilty of manufacturing or possession of burglar's tools when he manufactures or has in his possession any tool, instrument or other thing adapted, designed or commonly used for advancing or facilitating offenses involving unlawful entry into premises, or offenses involving forcible breaking of safes or other containers or depositories of property, under circumstances manifesting an intent to use or knowledge that some person intends to use the same in the commission of an offense of such character. . . ."

404 (1978), citing *Beck* v. *Ohio,* 379 U.S. 89, 91, 85 S. Ct. 223, 13 L. Ed. 2d 142 (1964); *Brinegar* v. *United States,* 338 U.S. 160, 175–76, 69 S. Ct. 1302, 93 L. Ed. 1879 (1949). Murphy was well aware of the high incidence of burglaries in the area and recognized the Fabricatore vehicle by its marker number as one which had been identified by the police department as possibly connected with the crimes. The car accelerated upon passing him and a fellow officer noticed that one of the passengers ducked as they rode by. This prompted Murphy to articulate his belief that the driver and the occupants were trying to give him "the brush-off." Murphy also knew the identity of the driver and knew that he was neither near nor headed in the direction of his home. When Murphy stopped the car, he noticed that Fabricatore immediately hopped out and approached the cruiser to offer his license, as if to keep Murphy away from the car. It was when Murphy told Fabricatore to return to the vehicle to get the registration that he saw, by means of a spotlight, the screwdriver in the glove compartment. A few moments later he saw the pry bar[11] in plain view on the floor.

To establish probable cause, it is not necessary to produce a quantum of evidence necessary to convict. *Draper* v. *United States,* 358 U.S. 307, 311, 79 S. Ct. 329, 3 L. Ed. 2d 327 (1959); *State* v. *Middleton,* 170 Conn. 601, 603, 368 A.2d 66 (1976); *State* v. *Cobuzzi,* 161 Conn. 371, 376, 288 A.2d 439, cert. denied, 404 U.S. 1017, 92 S. Ct. 677, 30 L. Ed. 2d

---

[11] The defendants assert that this was a tire iron, standard equipment in a motor vehicle. The state argued, however, that even if the instrument was a tire iron its location on the floor of the back seat instead of in the trunk with the other tools necessary to change a tire, also supported the officer's belief that an offense had been committed.

664 (1972). Flight from a police officer may be a substantial factor in the determination of whether he has probable cause to arrest. *State* v. *Middleton,* supra, 605. Here the conduct of the defendants and the surrounding circumstances which preceded the arrest support a finding of probable cause.

The defendants' two remaining claims concern evidence introduced by the state. The defendants contend that the prosecution, to prove that the value of the property taken exceeded $2000, introduced testimony of a jeweler who testified to its replacement value, not its market value.[12] General Statutes § 53a-121 (a) (1) provides that "value of property or services," as used to define first degree larceny in § 53a-122 (a) (2),[13] "shall be ascertained as follows: (1) Except as otherwise specified in this section, value means the market value of the property or services at the time and place of the crime or, if such cannot be satisfactorily ascertained, the cost of replacement of the property or services within a reasonable time after the crime." The jeweler testified on direct examination that the total market value of all the items identified as having been taken from the house and found in the trunk of the Fabricatore vehicle was $2310. On the basis of his knowledge and experience, he estimated that there would have been no more than a 5 percent rise in the valuation of those items from the date they were taken, April 15, 1977, to the date of his appraisal, September 9, 1977. Thus, according to his appraisal and testimony on direct, the market

---

[12] Although the defendants excepted to the jeweler's qualifications as an expert, they do not argue that his testimony should have been excluded for this reason. Their attack on his testimony focuses instead on his characterization of value.

[13] See footnote 5, supra.

value of the property taken on April 15, 1977, exceeded $2000. On cross-examination, defense counsel solicited a response from the witness in which he described his appraisal of one of the rings as "what it would cost to replace it then, September 9."[14] It is this response which the defendants claim indicates that the witness' appraisal was based on replacement and not market value.

The defendants' interpretation of the witness' testimony on cross-examination is not reasonable. It is true that he used the word "replace." In view of the wording of the question posed to him, however, it is clear that the appraiser was testifying to what the ring was worth as a used ring, that is, what it would cost the victims of the burglary to replace it or another to purchase it as a used ring. Furthermore, the statute provides that replacement value is determinative if and only if market value "cannot be satisfactorily ascertained." General Statutes § 53a-121 (a) (1). The state's expert testified to market value on direct examination, and there was no evidence that the market value of the property taken could not be satisfactorily ascertained. Nor was there any evidence that the replacement value for the jewelry and silver would have

---

[14] Defense counsel's questions and the appraiser's answers are quoted in the state's brief:

"Q. [By Defense Counsel] My question is with regard to that specific ring is $225 what the ring was worth as a used ring or is that what it would cost me, let's say, to go into your store and buy, you know? What is the value of it. The basis for your giving us a number of $225.

A. [By The Appraiser] It is what it would cost to replace it then, September 9.

Q. All right. The next question is if that was what it would cost you to replace it, does that mean that that is the value of that specific piece of jewelry?

A. As far as I am concerned, yes."

differed from the market value set by the witness on direct. Furthermore, the defendants concede that the court properly instructed the jury on value. In addition to being instructed that the state had to prove market value, the jury was instructed that if they found the market value of property taken[15] to be less than or equal to $2000, they could find the defendants guilty of larceny in the second, third or fourth degrees. Considering the testimony on value as a whole, we cannot conclude that the appraisal of the state's expert was conducted according to replacement and not market value, or even that replacement value differed from market value. The court's instructions were proper and the jury could have reasonably concluded that the defendants were guilty beyond a reasonable doubt of first degree larceny without resort to speculation and conjecture. *State* v. *Saracino*, 178 Conn. 416, 419, 423 A.2d 102 (1979); *State* v. *McGinnis*, 158 Conn. 124, 129–30, 256 A.2d 241 (1969).

The defendants' final claim of error is that the trial court should have stricken the pry bar and a screwdriver from evidence because the prosecution failed to show their relationship to the alleged crimes and the prejudicial impact of these items outweighed their probative value.[16] This court has repeatedly said that " ' "Evidence as to articles found in the possession of an accused person sub-

---

[15] The court also instructed the jury that they could not include their own estimated values of other property taken, including a calculator and typewriter, because the state introduced no evidence of their market value.

[16] When all the evidence had been admitted, the defendants moved to strike the pry bar, gloves and screwdrivers on these grounds. The court denied the motion. The defendants claim error only with regard to the screwdriver found in the glove compartment and the pry bar. The screwdriver and gloves found under the seat were originally admitted without objection by the defendants.

sequent to the time of the commission of a crime for which he is being tried is admissible only if it tends to establish a fact in issue or to corroborate other direct evidence in the case; otherwise the law does not sanction the admission of evidence that the defendant possessed even instruments or articles adapted to the commission of other crimes . . . . The reason is analogous to that applicable to evidence of other crimes committed by a defendant but unrelated to the offense under investigation." . . .' " (Citations omitted.) *State* v. *Onofrio,* 179 Conn. 23, 28, 425 A.2d 560 (1979). As the state concedes, there was no direct evidence that the pry bar and screwdriver found in the defendants' possession were the tools used to forcibly enter the home. The state's introduction of the pry bar and the screwdriver, however, tended to corroborate other direct evidence in the case. The state introduced these items through the testimony of Murphy who identified them as the pry bar he had taken from the back seat of the vehicle and the screwdriver found in the glove compartment. Mrs. Baer, the victim of the housebreak, then described the appearance of the door which had been equipped with dead bolt locks. She said that "some sort of instrument had broken the door down and the molding around the door was knocked off." The police sergeant who had accompanied Fabricatore to the home to begin an investigation the night the defendants were arrested testified that "the rear door of the house had been forcibly entered" and "the inner molding on the right hand side which was in the area of the lock . . . was pushed in toward the inside of the house." The state also introduced as exhibits two photographs from which the jury could observe the extent of the damage done to the door and the extent to which an unusually strong

object would have been necessary to effectuate the break-in. Fabricatore also testified that when he drove the defendants to the scene of the crime that night "two pairs of gloves, two screwdrivers and a pry bar" were in the car and "the two screwdrivers were in the front seat with the crowbar underneath the front seat between Wayne and I and the gloves were in the same place." His testimony indicates that the location of the pry bar and screwdriver in question changed sometime between the defendants' arrival at the home and their encounter with Murphy. " 'Evidence is admissible when it tends to establish a fact in issue or to corroborate other direct evidence in the case. One fact is relevant to another fact whenever, according to the common course of events, the existence of the one, taken alone or in connection with other facts, renders the existence of the other either certain or more probable. Unless excluded by some rule or principle of law, any fact may be proved which logically tends to aid the trier in the determination of the issue.' . . ." (Citations omitted.) *State* v. *Villafane,* 171 Conn. 644, 674–75, 372 A.2d 82 (1976), cert. denied, 429 U.S. 1106, 97 S. Ct. 1137, 51 L. Ed. 2d 558 (1977). The state's introduction of the pry bar and screwdriver tended to corroborate other direct evidence in the case, and their probative value as exhibits was not outweighed by their prejudicial effect. *State* v. *Marquez,* 160 Conn. 47, 52, 273 A.2d 689 (1970). The prosecution had already introduced another screwdriver which the defendants did not move to strike and the probative value of the pry bar was significant.

There is no error.

In this opinion the other judges concurred.