STATE OF CONNECTICUT *v.* ANONYMOUS (1984–1)*

SUPERIOR COURT

---

* Thus entitled in view of the spirit and intent of § 54-142a.

BARNETT, J. The four defendants in these related cases are charged with either possession of narcotics or possession of narcotics with intent to sell. All defendants have moved to suppress the use in evidence of the narcotics and drug paraphernalia that were seized during a warrant-authorized search of the apartment occupied by H and L.

Two independent grounds are asserted as the basis for suppression. First the defendants contend that the warrant authorizing the search and seizure was "stale" because of a delay in time between its issuance and execution. The second claim is that the manner in which the search was conducted negated the authority of the warrant. The second claim is predicated upon an alleged violation of the so-called "knock and announce" rule. According to the defendants, an establishment of either of their claims[1] makes the search an unconstitutional[2] one and precludes admission of its fruits.

The state, in addition to denying the validity of those claims, also maintains that M and B lack standing to challenge the search.

On October 7, 1983, a warrant was issued authorizing a search of the apartment occupied by H and L and also a search of the persons of H, L and one G. Underlying the warrant was an affidavit in which facts were alleged to support conclusions of probable cause that the persons named therein were conducting illicit activities involving the possession and sale of narcotics at

---

[1] The defendants' claims are contained in two written motions filed by H and adopted by the other defendants. One motion is entitled "Motion to Suppress" and the other is entitled "Motion to Suppress Execution of Search Warrant."

[2] The defendants have cited both the fourth amendment to the constitution of the United States and article first, § 7, of the constitution of Connecticut.

the specified premises.[3] One week later, on October 14, 1983, at approximately 10:30 a.m., the warrant was executed.

The H-L apartment is one of two apartments on the second floor of a building in a housing project. The front door to the apartment is a thin metal one opening inward and containing a peephole. To the knowledge of the police, this door was the only means of entry other than sliding glass doors leading from the dining room to a balcony. Shortly before the warrant was executed, Detective R learned from a confidential informant how the door opened and that H's "kid" as well as H and L lived in the apartment.

Five members of the police department were present to execute the warrant. In addition to the leader, Detective R, there were Detective E, and three uniformed officers, policemen D and S and policewoman P. To accomplish their entry the police carried a sledgehammer and an instrument known as a halegan tool to pry open the door. And to protect against detection from within, Detective R covered the peephole with a piece of scotch tape.

While standing outside the door, the police heard the voices of a woman and child from inside the apartment and also the sounds of cartoons on the television set. Detective R, after consulting with Detective E, decided to gain entry by using a ruse. R testified that he pointed to policewoman P, a former undercover agent, and that she knew what to do.

---

[3] One sentence of the "Motion to Suppress" alleged: "The warrant does not set out any probable cause to believe that drugs would be in the apartment unless [G's] car was there." At the hearing, this claim was not seriously pursued nor was it briefed. As stated in the text, the affidavit established probable cause for the issuance of the warrant. See *State* v. *DeChamplain*, 179 Conn. 522, 527–28, 427 A.2d 1338 (1980).

Detective R then knocked on the door. A female voice asked who was there. Policewoman P responded by saying "Nancy" and asking if she could use the telephone or the telephone book.

At first the voice from within said, "Go away." The knocking and the "Nancy" routine were repeated three additional times. When the door was finally opened somewhere between a crack and twelve inches by B, who was babysitting for H's young daughter, the police, led by Officer S and Detective R started to rush in with guns drawn. R recalled that S yelled "police" and he stated that he probably screamed, "We have a search warrant," because he was carrying the original warrant and copies. Before the police effected their entry, B tried unsuccessfully to shut the door.

After entering the police found B and the little girl in the living room. In one of the bedrooms on the second level, H[4] and L were located. In another bedroom, the police discovered M who was an overnight guest. After all four defendants and the child were assembled in the living room, the search warrant was displayed and copies were distributed.

At the hearing, the police stated their awareness of the "knock and announce" rule and admitted that they did not comply with its provisions. Two reasons, however, were advanced for justification or excuse. One such reason was that narcotics and drug paraphernalia could be disposed of quite easily upon an announcement by the police or during a breaking of the door.

---

[4] Included among the allegations in the "Motion to Suppress Execution of Search Warrant" was that "[H] was not dressed at the time of the search and was forced to stand naked in front of a male police officer. She was searched in the nude by male police officers and not allowed to dress until she was actually taken into custody." None of these allegations was established. The uncontradicted evidence was that H was wearing a dressing gown and that she changed into street clothes in the presence of P, the policewoman.

Detective R stated that when the object of a search is narcotics, the police allow between five and ten seconds before proceeding to break in. R, himself, had never waited longer than one minute.

The other reason was that the safety of the child might have been jeopardized if the door had to be broken down or pried open. Detective E testified that 80 percent of search warrants are executed through forcible entries. According to E, children are sometimes placed behind closed doors to delay entries so that, in the interim, a destruction of narcotics can be accomplished. In E's fourteen years of service, however, he recalled only one instance where a child had been struck by a door. And E, himself, had never been on a raid where a child was injured.

General Statutes § 54-33c recites that search warrants "shall be executed within ten days." The statutory language is a legislative determination that a ten day period satisfies the traditional requirement that search warrants must be executed with "reasonable promptness, diligence or dispatch." *State* v. *Edwards,* 98 Wis. 2d 367, 375, 297 N.W.2d 12 (1980). The warrant at issue was executed within seven days.[5] A statutory time period does not mean, however, that all judicial control is abrogated. Conceivably, there may be instances where an execution within the legislatively prescribed time could result in an unreasonable and hence an unconstitutional search.

Most courts in considering "staleness" in the execution of a warrant have viewed the issue in terms of probable cause. The precise question to be asked is whether the probable cause recited in the affidavit still

---

[5] The defendants have incorrectly assumed that eight days elapsed between the issuance and the execution of the warrant. When an act is to be done "within" a certain period of time, the day of the event from which the future time is to be ascertained is excluded from the computation. *Lamberti* v. *Stamford,* 131 Conn. 396, 398, 40 A.2d 190 (1944).

existed when the warrant was executed. *Donaldson* v. *State,* 46 Md. App. 521, 528–29, 420 A.2d 281 (1980); *State* v. *Edwards,* supra, 376. In plainer terms, the question is whether it is still likely that the items sought will be found in the place to be searched. *State* v. *Yaritz,* 287 N.W.2d 13, 16 (Minn. 1979).

The answer to this question depends upon variables such as the nature and location of the items and, most importantly, upon the alleged continuation of criminal activity. *Donaldson* v. *State,* supra, 530; *State* v. *Yaritz,* supra, 16–17. A decision as to whether probable cause continued to exist or had been dissipated by the time the warrant was executed is to be made independently of any justification for the delay or the conduct of the officers which may have caused the delay. *State* v. *Edwards,* supra, 373. A defendant has the burden to prove dissipation by a preponderance of the evidence. *State* v. *Edwards,* supra, 376.

Another approach to the issue concentrates upon the prejudice sustained because of the delay in execution. Under this view, the justification for the delay and the reasons for the officers' conduct are material factors. Courts adhering to this view hold that a defendant must be given the opportunity to show that unfair prejudice resulted from the officers' conduct. An example would be that the evidence would not have been discovered if the search had been conducted more expeditiously. *United States* v. *Bradley,* 428 F.2d 1013, 1016 (5th Cir. 1970); *United States* v. *McClard,* 333 F. Sup. 158, 166 (E.D. Ark. 1971); see also *State* v. *Edwards,* supra, 375.

In the present case, it is unnecessary to speculate as to which of the two views would be favored by our appellate courts.[6] Under either view, the defendants

---

[6] *State* v. *Cesero,* 146 Conn. 375, 151 A.2d 338 (1959), the only Connecticut authority cited by the defendants, is inapposite on this point. In *Cesero,* our Supreme Court invalidated a search warrant that was executed twenty-one days after its issuance. *Cesero* stands only for the undoubted position

here have failed to sustain their burden of proof. Earlier, this memorandum noted that the affidavit supplied probable cause for the issuance of the warrant.[7] The affidavit also presented facts to support a conclusion that the illegal activities detailed therein were of a continuing nature. Moreover, a trafficking in illegal drugs is ordinarily considered to be a regenerating activity. *Donaldson* v. *State,* supra, 530.

No evidence was introduced in this proceeding to rebut the continued existence of probable cause or to show that quicker action by the police would have produced a different result. On the facts of this case, the court, therefore, has no difficulty in holding that the search warrant was valid when it was executed within the statutory ten day period.

A considerably more complex question is presented by the defendants' claim that the evidence must be suppressed because the police failed to comply with the "knock and announce" rule.

Initially the defendants contended that the failure of the officers to announce their presence and purpose was ipso facto a violation of the fourth amendment to the United States constitution and article first, § 7, of the Connecticut constitution. This contention is inaccurate. In *Ker* v. *California,* 374 U.S. 23, 83 S. Ct. 1623, 10 L. Ed. 2d 726 (1963), Justice Jackson, in writing for the court, stated clearly that whether a lack of prior announcement would be equated with a constitutional violation depended upon the circumstances involved.

that "[u]nless the search warrant is executed within a reasonable time, it is invalid when the search is made." *State* v. *Cesero,* supra, 379. But *Cesero* must be read in the context of its times. In 1959, when the case was decided, there was no statutory provision governing the time within which a search warrant had to be executed. The ten day limit now contained in § 54-33c was adopted by the General Assembly in Public Acts 1971, No. 291.

[7] See footnote 3, supra.

A similar ruling has come from our former Appellate Session. *State* v. *Anonymous (1977-5),* 34 Conn. Sup. 531, 535, 375 A.2d 417 (1977).

From decisions like *Ker* v. *California,* supra, and *State* v. *Anonymous (1977-5),* supra, it is obvious that any given case requires a particularized inquiry. The inquiry, however, has a definitive starting point. In *State* v. *Mariano,* 152 Conn. 85, 94, 203 A.2d 305 (1964), cert. denied, 380 U.S. 943, 85 S. Ct. 1025, 13 L. Ed. 2d 962 (1965), our Supreme Court said: "From early colonial times we, in this jurisdiction, have followed the common-law requirement . . . that, in the absence of some special exigency, before an officer may break and enter he 'ought to signify the cause of his coming, and to make request to open the doors.' " *Semayne's Case,* 5 Co. Rep. 91, 77 Eng. Rep. 194 (1603), was cited as the original holding for the common law rule. Also, in *State* v. *Mariano,* supra, 95, the court described the common law rule as consistent with 18 U.S.C. § 3109, the statute governing the execution of search warrants issued by the federal courts.

In *Miller* v. *United States,* 357 U.S. 301, 305–309, 78 S. Ct. 1190, 2 L. Ed. 2d 1332 (1958), the United States Supreme Court fully explored the common law rule heritage, originating with *Semayne's Case,* of 18 U.S.C. § 3109. The statute is a codification of the common law rule. *Leahy* v. *United States,* 272 F.2d 487, 489 (9th Cir. 1959).

18 U.S.C. § 3109 (1982) provides: "The officer may break open any outer or inner door or window of a house, or any part of a house, or anything therein, to execute a search warrant, if, after notice of his authority and purpose, he is refused admittance or when necessary to liberate himself or a person aiding him in the execution of the warrant." And, although 18 U.S.C. § 3109 by its express terms refers only to search war-

rants, the United States Supreme Court has extended its requirements to entries for the purposes of accomplishing arrests with or without warrants. *Sabbath* v. *United States,* 391 U.S. 585, 588, 88 S. Ct. 1755, 20 L. Ed. 2d 828 (1968); *Miller* v. *United States,* supra, 308–309.

The required inquiry may reach three levels. The first question to be answered is whether the rule applies to a particular case. Secondly, it must be decided whether there has been compliance with the rule. If the answer to the first question is "yes" and the answer to the second question is "no," then the final question is whether the facts of a case warrant an exception to the rule.

The state has suggested that a rule which requires notice of the presence and purpose of the police should not be enforced when a warrant authorizes the seizure of easily disposable items such as narcotics. Some years ago, a Connecticut trial judge, *Mulvey, J.,* refused to allow a blanket exemption for drug cases. *State* v. *Anonymous (1973-5),* 30 Conn. Sup. 197, 199–200, 308 A.2d 251 (1973). Judge Mulvey's decision may not be binding precedent; the court, however, agrees with his reasoning that the rule, as stated in *State* v. *Mariano,* supra, 94, does not permit generalized a priori exemptions. Moreover, an examination of the authorities relied upon by the state demonstrates that they, with possibly one exception, do not provide contrary holdings.[8]

---

[8] Four cases were cited. Three of them, *People* v. *De Lago,* 16 N.Y.2d 289, 291, 266 N.Y.S.2d 353 (1965), *State* v. *Loucks,* 209 N.W.2d 772, 777–78 (N.D. 1973), and *State* v. *Spisak,* 520 P.2d 561 (Utah 1974), involved special statutory provisions authorizing judges to issue "no-knock" search warrants in instances where the items sought were narcotics or gambling material. The fourth case, *Henson* v. *State,* 236 Md. 518, 522–23, 204 A.2d 516 (1964), appears to favor a general exemption to the rule of prior announcement for drug cases.

The threshold question of applicability, in the present case, is complicated by the presence of the ruse. If only subterfuge were involved, the defendants would have no reason to complain. While there is an absence of reported Connecticut decisions, the federal courts have held uniformly that 18 U.S.C. § 3109 does not encompass entries accomplished by deception, fraud or ruse for the reason that there is no "breaking." *Sabbath* v. *United States,* supra, 590 n.7; *United States* v. *Beale,* 445 F.2d 977, 978 (5th Cir. 1971), cert. denied, 404 U.S. 1026, 92 S. Ct. 697, 30 L. Ed. 2d 676 (1972). In constitutional terms, the view of the federal courts is that an entrance resulting from deception is permissible so long as force is not involved.[9] *Smith* v. *United States,* 357 F.2d 486, 488 n.1 (5th Cir. 1966).

Where, however, a ruse if not the sole means of access and is combined with or superseded by force, 18 U.S.C. § 3109 has been held to be applicable. *United States* v. *Beale,* supra, 978; *Gatewood* v. *United States,* 209 F.2d 789 (D.C. Cir. 1953).[10] The difference between the two situations was always recognized at common

---

[9] E.g, *United States* v. *DeFeis,* 530 F.2d 14 (5th Cir.), cert. denied, 429 U.S. 830, 97 S. Ct. 92, 50 L. Ed. 2d 95 (1976), and *United States* v. *Glassel,* 488 F.2d 143, 145–46 (9th Cir. 1973), cert. denied, 416 U.S. 941, 94 S. Ct. 1945, 40 L. Ed. 2d 292 (1974) (where undercover agents entered premises by posing as purchasers of narcotics); *Ponce* v. *Craven,* 409 F.2d 621, 626 (9th Cir. 1969) (where a motel room door was opened in response to a police-arranged pretextual statement by the manager that there was a telephone call for the occupant); *Leahy* v. *United States,* 272 F.2d 487, 489–90 (9th Cir. 1959) (where a federal officer gained admittance by representing that he was from the county assessor's office).

[10] The factual situation of *Gatewood* v. *United States,* 209 F.2d 789, 790 (D.C. Cir. 1953), is instructive. Police officers knocked on the door of the defendant's apartment after receiving a tip that one Elizabeth Williams would be found there. When a voice from inside the apartment asked who was knocking, one of the officers answered, "From Western Union." The defendant opened the door but attempted to close it when he saw the three men. The police forced their way in. Only after the officers were inside did they explain their mission.

law. *Leahy* v. *United States,* supra, 490; *Accarino* v. *United States,* 179 F.2d 456, 460–61 (D.C. Cir. 1949).

Further, at the present time, a minute amount of force satisfies the "breaking" requirement. In *Sabbath* v. *United States,* supra, 590, the Supreme Court emphasized: "An unannounced intrusion into a dwelling— what § 3109 basically proscribes—is no less an unannounced intrusion whether officers break down a door, force open a chain lock on a partially open door, open a locked door . . . or [as in *Sabbath*] open a closed but unlocked door." Commenting on the language in *Sabbath,* the First Circuit concluded that the force required to effect a breaking was some physical action by the officer to remove the barrier that prevents his entry.[11] *United States* v. *Beale,* supra, 978. If this court applies these authorities to the facts at hand the court is required to find that here, too, a breaking occurred.

*Semayne's Case,* supra, as repeated in *Miller* v. *United States,* supra, 308, held: "In all cases where the King is party, the sheriff (if the doors be not open) may break the party's house, either to arrest him, or to do other execution of the [King's] process, if otherwise he cannot enter. But before he breaks it, he ought to signify the cause of his coming, and to make request to open doors . . . ." Apparently, some prior announcement is required. The rule rests upon the respect of the law for the individual's right of privacy in his house.[12] *Sabbath* v. *United States,* supra, 589; *Miller*

---

[11] Some state decisions appear to go farther and hold that a breaking can occur even if the police enter through an open door. E.g., *State* v. *LaPonsie,* 136 Ariz. 73, 74, 664 P.2d 223 (1983); *State* v. *Coyle,* 95 Wash. 2d 1, 5, 621 P.2d 1256 (1980).

[12] Other stated reasons for the "knock and announce" requirement are the safeguarding of officers who, upon an unannounced entry, might be mistaken for prowlers; *Sabbath* v. *United States,* 391 U.S. 585, 589, 88 S. Ct. 1755, 20 L. Ed. 2d 828 (1968); *Miller* v. *United States,* 357 U.S. 301, 313 n.12, 78 S. Ct. 1190, 2 L. Ed. 2d 1332 (1958); and prevention of unnecessary property damage. *State* v. *Coyle,* 95 Wash. 2d 1, 5, 621 P.2d 1256 (1980).

v. *United States*, supra, 313. "The length of time an officer must wait before breaking in after an announcement must be reasonable in the light of the circumstances in the particular case." *State* v. *Mariano*, supra, 94.

The state has claimed that the defendants have the burden of showing noncompliance, and the court agrees with the state's position. See *State* v. *Mariano*, supra, 91. In assessing the situation, however, the court must appreciate that the question of the legality of the entry presents an issue that is quite distinct from the validity of the search warrant. *Rodriguez* v. *Butler*, 536 F.2d 982, 985 (2d Cir. 1976). Also to be considered is the admonition from the United States Supreme Court that "[t]he requirement of prior notice of authority and purpose before forcing entry into a home is deeply rooted in our heritage and should not be given grudging application." *Miller* v. *United States*, supra, 313.

Perhaps, in this case, where uniformed officers were at the door when it was partially open, an announcement of the presence of the police was unnecessary. But even so, there was no prior announcement of authority or purpose. In the language which our Supreme Court, in *State* v. *Mariano*, supra, 94, borrowed from *Semayne's Case*, supra, there was no announcement of "the cause of [the officers'] coming."

Upon the evidence presented, the court finds that if the all-important phrase, "We have a search warrant," was spoken at all by Detective R, it was said only when the detectives and the uniformed officers were forcing their way into the apartment. The defendants, therefore, have met their burden. An announcement of authority or purpose made simultaneously with the breaking is not sufficient compliance with the rule. *Miller* v. *United States*, supra, 310; *United States* v.

*Fluker,* 543 F.2d 709, 712 (9th Cir. 1976); *State* v. *LaPonsie,* 136 Ariz. 73, 75, 664 P.2d 223 (1983).

Obedience to "knock and announce" provisions may be excused upon a showing of some exigency peculiar to the case. *State* v. *Mariano,* supra, 94. Well recognized exceptions are set forth in *Ker* v. *California,* supra, 47 (Brennan, J., dissenting), and repeated in *State* v. *Mariano,* supra, 95, (1) where the persons within already know of the officers' authority and purpose; e.g., *United States* v. *Kulcsar,* 586 F.2d 1283, 1286 (8th Cir. 1978); (2) where the officers are justified in the belief that persons within are in imminent peril of bodily harm; e.g., *Read* v. *Case,* 4 Conn. 166 (1822); and (3) where those within are *then* engaged in some activity which justifies the officers in the belief that an escape is being attempted; e.g., *State* v. *Anonymous (1977–5),* 34 Conn. Sup. 531, 537, 375 A.2d 417 (1977); or that evidence is being destroyed; e.g., *People* v. *Maddox,* 46 Cal. 2d 301, 294 P.2d 6, cert. denied, 352 U.S. 858, 77 S. Ct. 81, 1 L. Ed. 2d 65 (1956).

Recently, the Supreme Court of Washington discussed the criteria by which the validity of exceptions is to be determined. The state has the burden of demonstrating an exception by pointing to some particular articulated facts and reasonable inferences therefrom that justify noncompliance. *State* v. *Coyle,* 95 Wash. 2d 1, 8–9, 621 P.2d 1256 (1980).

Relying upon Detective E's testimony that 80 percent of search warrants are executed through forcible entries, the state has claimed that such an entry would have imperiled the child or afforded an opportunity for destruction of the narcotics. The difficulty with the state's claimed exceptions is that they rest upon suppositions or, at best, upon an officer's general knowledge.

In order to be effective, the claimed exceptions must relate to the particular case. This requirement of par-

ticularity would have been satisfied if the police had received specific prior information that H or L, the two suspected parties, were prepared to act in a manner that would create an exigency or if the police, when they arrived at the apartment, were confronted with some contemporaneous activity that alerted them to the possibility of a pressing circumstance. *State* v. *Coyle,* supra, 9–10.

Before the warrant was executed, Detective R had spoken to his confidential informant. Apparently, no information regarding an imminent destruction of evidence had come from that source. And, while waiting outside the door, the police heard nothing from within to support a belief that evidence would be lost upon an announcement of their authority and purpose. Cf. *People* v. *Maddox,* supra, 306 (compliance with "knock and announce" statute excused when officers, after knocking, heard a voice say, "Wait a minute," and then heard the sound of retreating footsteps).

From the informant, the police knew that a child was one of the inhabitants of the apartment. Hearing the child's voice allegedly prompted the ruse. In the opinion of the court, knowledge of the child's presence was not tantamount to an emergency that excused compliance with the requirement of a prior announcement. See *State* v. *LaPonsie,* supra, 75 (police not entitled to disregard "knock and announce" statute upon hearing screaming children inside the house). There was no evidence to support a contention that the child would have been placed in a zone of danger by anyone within the apartment if the police had announced that they were present with a search warrant. Cf. *Read* v. *Case,* supra (where a party had announced that he would resist with force any attempt to apprehend him).

"[A] lawful entry is the indispensable predicate of a reasonable search." *Ker* v. *California,* supra, 53

(Brennan, J., dissenting), citing *Gouled* v. *United States,* 255 U.S. 298, 305–306, 41 S. Ct. 261, 65 L. Ed. 247 (1921). The failure of the state to establish its claimed exceptions means that the entry was illegal. The search, therefore, became an unreasonable one in contravention of the fourth amendment to the United States constitution. See *Ker* v. *California,* supra, 37–41. The evidence seized as a result of the unlawful entry is inadmissible against those defendants who have standing to complain. *Rodriguez* v. *Butler,* supra, 985.

The state does not question the ability of H and L to contest the validity of a search of their own home. *United States* v. *Salvucci,* 448 U.S. 83, 91–92, 100 S. Ct. 2547, 65 L. Ed. 2d 619 (1980); *Rakas* v. *Illinois,* 439 U.S. 128, 140, 99 S. Ct. 421, 58 L. Ed. 2d 387 (1978), reh. denied, 439 U.S. 1122, 99 S. Ct. 1035, 59 L. Ed. 2d 83 (1979). The state contends, however, that M, as an overnight guest, and B, as a babysitter, do not possess the requisite standing to complain under the United States Supreme Court's present interpretation of fourth amendment rights. A proper focus on this issue requires a review of certain decisions.

*Alderman* v. *United States,* 394 U.S. 165, 89 S. Ct. 961, 22 L. Ed. 2d 176 (1969), emphasized the important principle that fourth amendment rights are personal rights and may not be asserted vicariously. A person who claims aggrievement from an illegal search and seizure only through the introduction of incriminating evidence seized in a search of a third person's premises or property has not had any of his own fourth amendment rights infringed. *Alderman* v. *United States,* supra, 174.

Antedating *Alderman* v. *United States,* supra, however, was *Jones* v. *United States,* 362 U.S. 257, 80 S. Ct. 725, 4 L. Ed. 2d 697 (1960). In *Jones,* the court afforded automatic standing to contest a search where

the same possession needed to establish standing was an essential element of the offense charged. *Jones* v. *United States,* supra, 264. *Jones* also contained an alternative holding that "anyone legitimately on premises where a search occurs may challenge its legality by way of a motion to suppress." *Jones* v. *United States,* supra, 267.

The two standing doctrines of *Jones* were accepted as legitimate exceptions to the general principle stated in *Alderman* until the court's recent decisions in *Rakas* v. *Illinois,* supra, and *United States* v. *Salvucci,* supra. In *Rakas* v. *Illinois,* supra, 138–40, the court undermined *Jones'* rule of automatic standing for possessory offenses. And, in *United States* v. *Salvucci,* supra, 88–89, this aspect of *Jones* was overruled.

The opinion in *Rakas* v. *Illinois,* supra, 142–48, also reduced *Jones'* alternative holding of "legitimate presence" from a legal entitlement to claim suppression to only one of the many factors which should be considered in determining whether a person's fourth amendment rights have been violated. As stated in *Rakas* v. *Illinois,* supra, 143, and repeated in *United States* v. *Salvucci,* supra, 92–93, the ultimate question now to be decided is whether the party seeking suppression had a legitimate claim to privacy from governmental intrusion in the premises invaded by the search. In effect, under federal constitutional law, standing no longer presents a separate question. Aggrievement and infringement are tested by the same standard. *Rawlings* v. *Kentucky,* 448 U.S. 98, 106, 100 S. Ct. 2556, 65 L. Ed. 2d 633 (1980).

Nor does current Connecticut law appear to provide any separate and different criterion for standing. Our Supreme Court has not joined with some other state courts of last resort in holding that state constitutional or statutory provisions require continued adherence to

one or both of the standing doctrines of *Jones*. E.g.,
*State* v. *Settle,* 122 N.H. 214, 218, 447 A.2d 1284 (1982)
(constitutional); *State* v. *Alston,* 88 N.J. 211, 225–27,
440 A.2d 1311 (1981) (constitutional); *State* v. *Scott,* 59
Or. App. 220, 650 P.2d 985 (1982) (statutory); see *Com-
monwealth* v. *Podgurski,* 386 Mass. 385, 389, 391 n.11,
436 N.E.2d 150 (1982). In *State* v. *Altrui,* 188 Conn.
161, 179 n.6, 448 A.2d 837 (1982), our highest court
stated: "In view of [*United States* v. *Salvucci,* 448 U.S.
83, 100 S. Ct. 2547, 65 L. Ed. 2d 619 (1980)], what we
said respecting automatic standing in *State* v. *Perez,*
181 Conn. 299, 303–304, 435 A.2d 334 (1980), and *State*
v. *Paoletto,* 181 Conn. 172, 177, 434 A.2d 954 (1980),
is no longer controlling."

For M and B to prevail each of them, therefore, must
demonstrate that he or she had a reasonable expecta-
tion of privacy in the apartment inhabited by H and
L. *Rakas* v. *Illinois,* supra, 130–31 n.1. The question
is essentially a factual one. In *Rakas,* the Supreme
Court was well aware that neither litigants nor trial
judges were being provided with ready talismans. On
this point, the court was quite positive. "We are under
no illusion that by dispensing with the rubric of stand-
ing used in *Jones* we have rendered any simpler the
determination of whether the proponent of a motion
to suppress is entitled to contest the legality of a search
and seizure." *Rakas* v. *Illinois,* supra, 140. One phase
of the issue, however, is settled. In addition to a per-
son's anticipation of being free from governmental
intrusion, the privacy must " 'be one that society is pre-
pared to recognize as "reasonable." ' " *Rakas* v.
*Illinois,* supra, 151 (Powell, J., concurring).[13]

B's uncontroverted testimony was that on October
13, 1983, she came to the apartment to babysit and had

---

[13] Justice Powell quoted from the concurring opinion of Justice Harlan
in *Katz* v. *United States,* 389 U.S. 347, 361, 88 S. Ct. 507, 19 L. Ed. 2d
576 (1967).

remained overnight. She had been hired as a babysitter by H four or five times previously and on two of those occasions she had stayed for the night. On the morning of October 14, 1983, when she heard the knock on the door, she was sitting on a couch in the living room putting pajamas on the child because the child had missed the school bus.

As the caretaker of the child, B undoubtedly had a socially acceptable expectation of privacy. A babysitter has an obligation to protect her charge from harm. Of necessity, this obligation entitled her to exclude others from the premises. *Rakas* v. *Illinois,* supra, 143–44 n.12.

A weaker case was presented for M, who came to the apartment late on the night of October 13, 1983, and slept there because he was a few miles from home. M, however, was not a random guest. He is a cousin of L and he has slept at the apartment approximately once every two or three months.

Certainly, there are some who would hold the view that to find a privacy interest in the defendant M amounts to a continuation of the discredited doctrines of *Jones.* Legitimate presence, however, is still a relevant albeit no longer a controlling factor. *Rakas* v. *Illinois,* supra, 148. And familial relationships certainly are encouraged by society. On balance, the court holds that M, also, had a reasonable expectation of privacy in the apartment.

Since each of the four defendants had "standing" to object to the illegal search, the evidence obtained in that search is inadmissible against all defendants.